840 F.2d 18
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sam M. BONTEMPO, Jr., Defendant-Appellant.
 No. 87-3235.
 United States Court of Appeals, Sixth Circuit.
 Feb. 22, 1988.
 
 Before LIVELY, Chief Judge, NATHANIEL R. JONES and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Appellant-defendant Sam Bontempo appeals his conviction on one count of conspiracy to distribute narcotics in violation of 21 U.S.C. Sec. 846 (1982). For the following reasons, we affirm his conviction.
 
 I.
 
 2
 On November 22, 1985, Bontempo, along with seven others, was indicted by a grand jury sitting in the United States District Court for the Northern District of Ohio. The seventeen-count indictment charged Bontempo and his co-defendants with violations of 18 U.S.C. Sec. 1962(d) (1982), conspiracy to violate the Racketeer influence Corrupt Organizations Act ("RICO"); 18 U.S.C. Sec. 1952 (1982), Interstate Travel in Aid of Racketeering ("ITAR"); 21 U.S.C. Sec. 846 (1982), conspiracy to possess marijuana, cocaine, and methaqualone for distribution; 21 U.S.C. Sec. 841(a)(1) (1982), possession with intent to distribute; and 21 U.S.C. 1 843(b) (1982), use of a telephone to facilitate drug trafficking. Bontempo was specifically charged in the RICO conspiracy, the ITAR count, and the conspiracy to distribute and possession offenses. All defendants except Bontempo pled guilty before trial.
 
 
 3
 Bontempo's trial began on December 2, 1986. At trial, the government introduced evidence in an attempt to demonstrate Bontempo's membership in a conspiracy which allegedly involved the wide ranging criminal activities of the Cleveland Mafia family, La Costa Nostra.
 
 
 4
 Bontempo's alleged association with the group began in 1980 when Joseph Gallo and Thomas Sinito, two group members, began to consider importing drugs from outside the country. In February 1980, Gallo and Sinito, accompanied by another member of the group, Carmen Zagaria, flew to Jamaica where they met Stanley Gottlieb. When they arrived, they met a man, "Henry," who had connections to provide the marijuana and who showed them a landing strip. However, no deal was consummated at that time and Zagaria, Sinito and Gallo returned to Cleveland.
 
 
 5
 Upon their return, they began to discuss a plan for smuggling marijuana from Jamaica into the United States. In May 1980, Gallo claimed to have a friend in Florida who had access to an airport. Gallo went to Florida with John Absher, Sr., a pilot, and the two inspected several possible landing sites. Gallo's friend in Florida was identified at that time only as "Sam."
 
 
 6
 Zagaria testified that he spoke with Gallo on a daily basis while Gallo attempted to make arrangements in Florida. When Gallo expressed his satisfaction with the facilities that were going to be made available to them, Zagaria authorized Gallo to pay "Sam" $5,000. Gallo indicated that the people with whom he was dealing were in the Tampa area. Sam Bontempo was a resident of Clearwater, a Tampa suburb.
 
 
 7
 Upon Gallo's return, he told Zagaria that his people in Florida could be trusted because they were Cleveland people living in Florida who Gallo had known all his life. Sam Bontempo is originally from Cleveland.
 
 
 8
 Several months after these initial transactions, Zagaria testified that he learned the full name of the "Sam" with whom Gallo had been dealing. Zagaria testified that Gallo told him that "Sam" was Sam Bontempo.
 
 
 9
 In September 1980, Gallo called Zagaria and told him "my buddy Sam is going to call you." A man named Sam called and gave Zagaria a Jamaica phone number. Zagaria went to a pay phone, dialed the number, and got Sam on the phone. Sam identified himself as the one who was in Florida with John Absher, Sr. The ensuing conversation was brief as the discussion centered mostly around the availability of a landing strip. Zagaria told Sam to look at the highway near a tower, because that was one place that he believed a plane could land. Several landing fields were mentioned and the conversation subsequently ended.
 
 
 10
 Zagaria eventually met Bontempo in November of 1980. Gallo introduced Bontempo to Zagaria as "my friend Sam from Florida." Zagaria identified Bontempo in the courtroom and said that the Sam Bontempo he met in November had the same voice as the man he had spoken to on the telephone in September.
 
 
 11
 Shortly after this telephone conversation, Gallo told Sinito and Zagaria that Bontempo had everything arranged concerning the pilot, co-pilot, and landing sites. Gallo indicated that he would pay Bontempo an additional $3,000.
 
 
 12
 Subsequently, a December 26, 1980 conversation between Bontempo and Gallo was intercepted by a bug planted at "Shoppings Our Service" ("SOS"), Gallo's purported place of business. (SOS allegedly was the place from which Gallo ran his narcotics business.). During this conversation, Gallo asked Bontempo if he could pick up a load of marijuana in Florida for him. Bontempo responded that he had a four-wheel drive pickup which could hold 1,500 pounds of marijuana. However, after a lengthy conversation, the parties concluded that Bontempo could not return to Florida until after the New Year's holiday, which was too late for Gallo's purposes.
 
 
 13
 On December 30, 1980, law enforcement agents seized a note pad bearing Gallo's fingerprints from Gallo's office at SOS. The note pad contained information concerning an air strip, lighthouse and coordinates, and the following handwritten information:
 
 Pilot-$20,000
 Plane-$5,000 (front)
 Expenses-$3,000 (front)
 Sam, etc.-$15,000
 Total-$43,000
 
 14
 Bontempo was subsequently arrested and in a search of his car conducted incident to his arrest, law enforcement officials seized an address book from Bontempo which contained phone numbers for Gallo, Sinito, and co-conspirator Russell Papalardo. An address book seized from Gallo's residence on December 30, 1980 contained telephone numbers for various conspirators, including that of Bontempo's home.
 
 
 15
 After the above evidence was presented, two counts of the indictment were dismissed. The jury, however, was instructed on the remaining counts on December 11, 1986 and began its deliberations. On December 15, 1986, the jury found Bontempo guilty on Count Two, the conspiracy to distribute marijuana, and not guilty on all remaining counts. On February 26, 1987, Bontempo was sentenced to six years imprisonment for his conspiracy conviction. Thereafter, this notice of appeal was timely filed.
 
 
 16
 On appeal, appellant presents three issues. First, Bontempo challenges the sufficiency of the evidence to support his conspiracy conviction. Second, he argues that there was no probable cause to support the wiretap order pursuant to which his December 26, 1980 conversation with Gallo was intercepted. Finally, Bontempo contends that the search of his automobile pursuant to his arrest was unlawful. All three of these assertions are without merit.
 
 II.
 
 17
 Bontempo first contends that the evidence produced at trial was not sufficient to support his conspiracy conviction. This argument, however, fails for the following reasons.
 
 
 18
 It is well settled that a criminal defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden. In reviewing the denial of a judgment of acquittal, all evidence must be viewed in the light most favorable to the government. See, e.g., United States v. Pennell, 737 F.2d 521, 537 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985). In making such a determination, it is not up to us, as a reviewing court, to make credibility determinations or to weigh the evidence. Rather those functions are distinctly vested within the sound discretion of the jury. Glasser v. United States, 315 U.S. 60, 80 (1942). Furthermore, the conviction must be upheld if any rational trier of fact could find the defendant guilty beyond a reasonable doubt. United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir.1986), aff'd, 107 S.Ct. 2775 (1987). In attempting to demonstrate Bontempo's connection to a conspiracy, an agreement by him to participate "in what he knew to be a joint venture to achieve a common goal" must be shown. Id. Such an agreement, however, may be shown by circumstantial evidence. Id. Indeed, it is not necessary to show that Bontempo knew every member of the conspiracy or knew the full extent of the enterprise. United States v. Shermetaro, 625 F.2d 104, 108-09 (6th Cir.1980). Such evidence can be inferred from the interdependence of the enterprise. Bourjaily, 781 F.2d at 544.
 
 
 19
 Pursuant to these principles, the government has set forth sufficient evidence to demonstrate a conspiracy and Bontempo's connection to it. Indeed, in viewing the evidence in the light most favorable to the government, the evidence demonstrates that Bontempo was involved in choosing an air strip for use in importing marijuana from Jamaica and was paid $8,000 for his services. The note pad seized from Gallo's office also indicates that "Sam," i.e. Bontempo, was paid for these services. Further evidence consists of an address book containing phone numbers of several co-conspirators which was seized from Bontempo at his arrest. This evidence, when coupled with Bontempo's December 26, 1980 conversation with Gallo concerning the transportation of marijuana from Florida to Cleveland, is certainly sufficient to support his conviction. And, as this court held in United States v. Stone, 748 F.2d 361 (6th Cir.1984):
 
 
 20
 [we] will reverse a judgment for insufficiency of evidence only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole, and that this rule applies whether the evidence is direct or wholly circumstantial. [Furthermore,] [i]t is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt.
 
 
 21
 Id. at 363 (emphasis added). Pursuant to such reasoning, appellant's sufficiency argument fails.
 
 III.
 
 22
 Bontempo also presents two other arguments. He first alleges that the lower court erred in not suppressing the intercepted December 26, 1980 conversation between Gallo and himself. He claims that the conversation should have been suppressed because the authorization of the wiretap and electronic surveillance of SOS, Gallo's place of business, was not supported by probable cause. He also argues that several other deficiencies are present with regard to the wiretap authorization.
 
 
 23
 After reviewing the affidavit and the lower court's determination on this issue, we find that no error was committed. Thus, appellant's arguments are without merit.
 
 
 24
 Second, Bontempo alleges that his fourth amendment rights were violated by an unlawful search, conducted incident to his arrest, of his car and briefcase. This argument is also without merit.
 
 
 25
 It is well settled that law enforcement officers, when effectuating a lawful custodial arrest, as here, may examine the entire passenger compartment of a car, including any containers found therein, whether such containers are opened or closed. See New York v. Belton, 453 U.S. 454, 460-61 (1981).
 
 
 26
 Therefore, for all of the foregoing reasons, appellant's conviction is hereby AFFIRMED.